Your Honor, Philip Bronson for Samuel Lindblad, the appellant, who is challenging, among other things, the admission of his 1996 conviction under Ninth Circuit long-standing precedent before the district court may admit evidence of a prior act for purposes of proving intent. The government must make a threshold showing of similarity between the prior act and the charged conduct. This we submit was not done when the government sought and had proof of his 1996 conviction for child sexual endangerment admitted. The dissimilarities are great. For instance, in the 1996 conviction, this was from the beginning to the end a sting operation. The government formed the whole organization for the commission of the offense by the detective posing as a 14-year-old boy. So while in the instant case, which is the sting operation, not the 1996 conviction, the government formed a travel agency in order to – The district court seemed to go right to the heart of the matter and looked to see – acknowledge that – or noted on the record that they don't have to be identical. And to look at the – and looked at the sort of general similarities, which are pretty striking, you know, as the district court noted, are very similar. An arranged meeting with a young boy? But in the 1996 incident, the defendant knew the child or the young boy. In this case, there was not even the existence of that person. There was no person in existence. Not only was it not the same – What was the purpose of the trip? The purpose of the trip was to engage in some activity with – With? With a minor child in Mexico. But that child was not known. Well, the intent was the question. The only reason this 1996 conviction had any relevance at all was to intent, not to the facts of the case, but to the intent. Now, why isn't it relevant to the intent? Well, there may be some relevance, but the relevance is tenuous because of the dissimilarities. The fact that there was no child, the fact that the distances were huge, the fact that he traveled all over the country to get to Los Angeles, and from there they were going to Mexico, that is a substantial difference. And these – and then the creation of the travel agency is – Well, that goes to the government's intent. That doesn't go to the intent of your client. Well, to have an intent to – Well, also going to the issue of intent was the fact that in the 1996 incident there was clear proof of his intent to engage in substantial sex with a child, with an existing child. The real live boy in the 1996 case, and here we have a fictitious victim who is – Here we have a fictitious victim who the defendant was claiming he was just going there to involve himself in some form of activity with the child. In other words, he thought he wasn't convicted of committing an illicit act with a minor child. He was convicted of travel and conspiracy. I have a question for the government about that, but he did travel, didn't he? And he did travel with some kind of intent, and the issue before the jury was what was his intent? Well, the defendant never conceded that it was his intent to have – engage in a sexual act with that child, where that intent was pretty clear in the 1996 incident, where the kind of statements he was making to the detective, who he thought was the boy, that intent was pretty clear there. But that's just the point, that the intent was at issue in the case. The intent was an issue. I think that was one of the prime issues in the case was the intent issue, which was never conceded by the defense, the issue of intent. The problem with this – the problem with the admission of this prior conduct was that it tended to foreclose the issue from the jury. It tended to establish in the jury's mind that he was going to Mexico with the intent to have substantial sexual conduct with the child. But that was never conceded. Also, there's the issue of the substantial inflammatory prejudice by the admission of this evidence. Well, there's not much doubt about the prejudicial effect of that kind of evidence. The question is whether it does go to the intent, and that was limited. There was a limited instruction, limiting instruction that it went only to the intent, not to the – any alleged facts. Before you run out of time, I wanted to ask you about the admissions. There was some testimony of admissions that he made to officers after he was arrested. Now, don't those also go to show he intended to meet a child in Mexico for some kind of erotic purpose? Now, whether it's illicit sex or whatever, that was a jury question, but it does show some – he did admit some intent. He did admit the intent was to go to Mexico to meet with the child, to become familiar with him, et cetera, et cetera, but not to have sexual contact that would create the offense. And that I would submit and reserve my time for rebuttal, unless there are further questions. I don't have any time. That's fine. Thank you. Good morning, Your Honors. May it please the Court. Jennifer Corbett on behalf of the United States. Your Honor, in this case, the law is not really in dispute. The judge applied the proper standard on the 404B. The jury was properly instructed and based its verdict on the evidence, which the government believes is sufficient to support both convictions. In addition, the district court properly applied the 3553A factors in its sentence and did not abuse its discretion in imposing the conditions of supervised release. But to go first to the 404B question, as the district court found, and it did not abuse its discretion in doing so, there was a striking similarity between the 1996 conviction and the issues that were being disputed in defendant's trial. Namely, what was defendant's intent in his travel? In this case, travel to Los Angeles with the ultimate idea of going to Mexico. And in the prior conviction, defendant traveled to a location, again, to meet a minor for the purpose of having sexual activity with that minor. The district court properly found that these, because of the evidence of intent and the dispute as to the defendant's intent, the government's burden to prove that intent, there was a sufficient similarity under the 404B test. And in addition, the probative value was such that it outweighed the danger of any unfair prejudice to the defendant. Really, Your Honors, the facts in this case are what make this case truly compelling and compelled both the verdicts in this case as well as the sentence. The defendant, from the immediate context of this case, was a member of NAMBLA, an organization that, in and of itself, promotes sexual activity between men and boys. Defendant was not a casual or an accidental participant in the sting operation that he ultimately became a part of, that he ultimately joined and pursued. He was, from the start, someone who expressed his interest in having sexual activity with boys and then showed that he was willing to act on it, that he was, in fact, wanting to have sex with boys and was willing to take action to pursue those boys, to have access to those children, and ultimately to sexually assault a particular child that he had in mind and, in his words, that he had reserved for him. Defendant's intent was then further shown by his contacts with the undercover agents. First, he had extensive discussions with the initial undercover agent at a dinner meeting. They discussed a number of topics, including defendant's lack of sexual interest in his wife, his preference for boys, and that dinner ended with the invitation by the undercover agent to defendant to join this trip, which was described as a boy lover's delight, and defendant said, really, it's something I almost can't say no to. And, in fact, defendant was so interested that, by the next day, he had contacted his co-defendant, Mr. Stutzman, and they had contacted the travel agency, and they had signed up almost immediately. And then defendant called back the undercover agent, said, we have signed up. He said he was so excited that he couldn't sleep, and he looked forward to the trip. And Mr. Bronson didn't have time to argue it, but in his brief, he made a point about the conspiracy. What was the government's theory as to who the conspirators were on the conspiracy count? They were Mr. Lindblad, Mr. Stutzman, and Mr. Ervin. Now, in his brief, he claims that there was no proof that they shared any common intent, other than to go to Mexico to meet young boys. Is that enough to show a conspiracy? That is in this case, because what was charged was that the conspiracy involved the agreement to commit the violation of the 2423C violation, which is to travel in foreign commerce and to have sex. I don't have much doubt about the travel. They actually traveled. But on the conspiracy count, I did find a little question about that. I wondered how you make out the conspiracy, because he couldn't really conspire with the undercover agent. Of course. They didn't have any commonality of intent. So it has to hang on the relationship between Lindblad, Stutzman, and Ervin, right? Yes, that's correct. And their intended actions. They all belonged to this club that met in Florida at some earlier date. Yes. And that's where they met the agent who entrapped them in this case. Well, the government's position is certainly that they were more than willing participants in this particular sting operation. They don't like the word entrapment, but this is pretty close. Didn't the agent pay for part of the travel money? Yes, after defendant expressed the money. That gets pretty close to entrapment, doesn't it? Well, that was at the express essentially concern raised by defendant that he didn't have enough money, but he really wanted to go. And so a loan was offered, and defendant jumped at the chance and, in fact, made sure that he executed a promissory note. He was very concerned about paying that back and wanting to go on the trip. I actually think it cuts the other way to show that he was willing to borrow money. And he clearly had shown that he was willing to travel to New Mexico, from New Mexico to Miami, just to meet with these like-minded individuals. And now, in fact, without having money, he has the chance to go down to Mexico and have a boy reserved for him who's being paid, a child who's being paid to engage in sexual activity with him, and he jumps at the chance. Even though he has no money, he makes it happen. And the agent did offer him the opportunity. There's no hiding the ball on that, Your Honor. This was a sting operation, but it's exactly the type of person like a defendant who is predisposed and who is offered little or no inducement who then jumps at the opportunity. Let me ask you a question which I think is pretty academic, but it's still part of the mix here. When he gets out of jail when he's 90 years of age, he has to deal with these supervised release conditions. As I read them, they're not inappropriate, but they seem to be kind of broad in some respects. Should we spend any time sort of fine-tuning those restrictions in case he does get out of jail? It is not an academic, purely academic question, Your Honors, because of the possibility that he might get out. And the district court was obviously concerned that should he get out, he would need to be supervised. And the conditions are designed to do just that, specifically the ones that have been challenged by the defendant. First, the child pornography ban. Clearly, there would be no reason for a defendant to have any child pornography except... I think, and maybe I'm not making myself clear, I think many of them hit the mark, but there are a couple that trouble me, can't go to swimming pools and arcade facilities. I don't know. I'm not terribly troubled by it, because it's basically an academic exercise. But I just wonder, in terms of the nicety of the law, whether we should focus a little bit on some of these restrictions and maybe give a practical application to them or just let it go. What do you think? I think the court should uphold them. And the circuit's precedent in Reardon really guides the court's... Reardon did inject, you know, some qualifications as some sort of guidance, you know, to probation that you don't want to go overboard on these things. Do you think we should do something like that, too? I think Reardon, and I'm speaking with respect to the restrictions on defendant's access to children, Reardon set forth a framework for the district court, and, of course, that's going to be based on the facts of the particular case. In the facts of this case, defendant had shown that over and over again he could not stay away from children. He could not control his interest in children. And, in fact, before the district court was evidence that as soon as he got released from prison and began to live in the community in New Mexico, he was still seeking out children. He engaged in what he even admitted were high-risk behaviors. So you don't think there's any need to do any Reardon fine-tuning here is your answer, correct? That's correct. And really the district court always has the option to modify the conditions should a defendant's circumstances during supervised release period cause some concern or some issue with respect to how those conditions are being enforced or how they're being interpreted. I think that's especially significant here where there is a significant sentence of incarceration because a defendant's position may have changed during that time, depending on the community that he is released into. If there was to be some specific concern, the district court could always revisit that at that time and modify the conditions perhaps as needed. And the court has the flexibility in this case to do that at that point. When is he likely to get out of prison if he lives? It would be approximately 85 percent. And we're talking a good 27 years from his original arrest date, which was in 2005. And he was what, 58 at that time? He was approximately 57 at the time that he was arrested. And the district court was very mindful in creating a sentence of defendant's age and really took that into account and understood what it was doing. That's quite clear from the transcript of the sentencing here. And was really brought to, I mean, the district court sort of shed a lot of light on its decision and how it made its decision that this sentence was necessary. And really, ultimately the court concluded that that was the only way to protect the community because of this defendant's background, because of this defendant's characteristics, his history, his really lifelong history of wanting to abuse and acting out on his desire, his sexual desire for children. In fact, the district court commented that it wasn't even sure that 30 years was sufficient, but since the government believed it was sufficient, the district court was satisfied that that would be an appropriate sentence. The question came up about the disparity in the sentence of the co-defendants. They didn't have any recidivism record, is that the case? That's correct, Your Honor. So they were first-timers as far as the record is concerned. That's correct, Your Honor. That was the difference. That was one of the differences. There was a substantial difference, apparently, in the sentencing. There was, and on its surface, without more, had the court not had the record that it had in front of it regarding this defendant, it might be difficult to justify that. However, in this case, there is such an extensive record about this defendant's history and his characteristics, and also the offense characteristic of his that made a difference in the guidelines. And recall that the guidelines sentence in this case, the range was 235 months to 293 months, and that's the guidelines. So even on the guidelines calculation, this defendant's exposure was considerably more because he wanted to offend with a boy as young as 10 years old, and that made a difference. He also obviously went to trial. Both as a straight calculation, but also because he was a repeat and dangerous offender against minors. Let me ask you this question. I do a lot of sentences, and I constantly am confronted with having to consider that part of 3553A, which talks about disparities amongst similarly situated defendants. And the question is whether or not I should consider disparity amongst co-defendants or whether there's a broader national guideline that I must consider. It seems from my research that the Ninth Circuit hasn't chimed in on that issue. Do you have any thoughts about that? It has in a recent case, and the name is escaping me, but I believe it was decided on the 15th of October, not in this type of situation. It was in a drug case, but the circuit indicated that the national question is paramount over the question of disparity amongst co-defendants. The question is can we or ought we consider disparity amongst co-defendants at all? There is implicit in at least the guidelines calculation a comparison amongst co-defendants, because in order to even arrive at a calculation, issues have to be considered, such as the role in the offense, what was someone's role in the offense, and that involves a comparison. But I'm talking about the specific part of the 3553A mix, which talks about disparities and whether that adds anything to the prior law. Well, it talks about unwarranted disparities. It both takes into account the particular conduct in the case, as well as the conduct of the violation in general. Measuring whether a minor role adjustment is warranted does necessarily implicate having to compare the activity of a particular defendant with the general activity of people committing that type of crime, not really one defendant against the others. I understand that. But I just was wondering what the Ninth Circuit is doing about this type of situation. It's moving. Every day it seems to be moving in the direction of post-Booker clarity. Could you just, following up on Judge Goodwin's question about the conspiracy, could you just run through that for me, the evidence that establishes beyond a reason, you know, there was a conspiracy here? Certainly, Your Honor. From the get-go, defendant was, in fact, the one who recruited his co-defendant, Mr. Stutzman, and he informed Stutzman of the trip. They called the undercover travel agency representative together, literally were on a three-way phone call, and during that time they expressed their interest in the trip. The circumstances of the trip were explained to them, and they each asked for their preferences. And preferences, in this case, meant what kind of boy they wanted to have sexual activity with in Mexico. And they both expressed their individual preference. They were also told that they would be traveling on a boat together. They were told that they then would arrive in Mexico without custom scrutiny and would have access to the child while each of their children while they were down there. But even more significantly, Your Honors, was the meeting that took place immediately before the boat trip. The night before the boat trip, there was a meeting that included defendant, Mr. Stutzman, Mr. Irvin, and the undercover agents. But significantly, there were a number of topics discussed about this, really this venture that they were going on together because they were all going to be on the same boat. They were all going to be on the same, as part of the same arrangements. The boys would be provided to them. There was, in fact, a discussion of swapping boys during the trip and the relative merits of swapping boys and whether or not they could and that it would be up to them as a group. There was also a discussion of tipping the boys. Mr. Stutzman expressed a concern about whether or not they should be tipping their particular boy individually or whether they should pool resources as a group. There were discussions that made it clear that this was a joint venture. A defendant, in fact, acknowledged at one point, he said, we are the ones carrying the risk. This was something that they were undertaking together. Physically, they would be located in the same boat. There was a discussion about not flaunting or not engaging in any kind of sexual behavior in front of the captain who was going to be tacitly aware of what was going on. But the operator said, there are bedrooms and you can take the boys into the bedrooms. So this was really one location and one tour that they would be going on together. And secrecy, in fact, and the ability of each of the participants to carry out the illicit activities depended on each other. And they were all part of this venture. The defendant also recognized that, in fact, if one of them turned out to be an undercover agent, which in fact was the case, that the venture would then be sunk. If there are no further questions, the government would submit. Thank you. You had some rebuttal time. Just a moment. I'm not sure on the conspiracy issue, in terms of what the government just said, as to when this conspiracy was formed, whether it was formed when the travel agency proposal was first submitted or whether it was formed that evening before the departure, the proposed departure. And this is just one added factor to show that it is not very clear beyond a reasonable doubt as to what the agreement was or even when it was formed. And I would submit on that. Okay. Thank you so much. Appreciate the argument. The matter will be submitted for decision and we'll recess for the day. We're adjourned.
judges: Goodwin, Paez, Block